## J. E. WHITESIDE V. HARRY TRENTMAN, JR.

No. 8039. Decided April 14, 1943.
(170 S. W., 2d Series, 195.)

*Woodruff & Holloway* and *R. R. Holloway,* all of Brownwood, for petitioner.

It was error for the Court of Civil Appeals to hold that the judgment of the trial court must be reversed because the plaintiff failed to obtain a finding that he would have elected to sell the retained leases at the market value if the second well had been drilled, and that such issue should have been submitted to the jury. Gwyn v. Wisdom, 14 S. W. (2d) 265; Fain-McGaha Oil Corp. v. Owens, 132 Texas 109, 121 S. W. (2d) 982; Gulf, C. & S. F. Ry. Co. v. McCarty, 82 Texas 608, 18 S. W. 716.

*E. M. Davis,* of Brownwood, *Slay & Simon* and *Simon & Simon,* all of Fort Worth, for respondent.

Even if plaintiff's theory that the defendant could be held liable in damages because of the failed to increase the market value of plaintiff's adjacent leases was correct, it could only be on the theory of anticipated profits and it would be necessary to prove and procure a jury finding that plaintiff could and would have sold the adjacent leases during the time the well was being drilled, and that defendant had notice of such fact. Coth-

erman v. Oriental Oil Co., 272 S. W. 616; Logan v. Elliott, 61 S. W . (2d) 157, 41 Tex. Jur., pp. 1100 and 1133.

MR. JUDGE HICKMAN delivered the opinion of the Commission of Appeals, Section A.

In the trial court petitioner, J. E. Whiteside, was awarded a judgment against respondent, Harry Trentman, Jr., for damages for breach of a contract to drill an oil well. The Court of Civil Appeals reversed the trial court's judgment and remanded the cause. 163 S. W. (2d) 418. Whiteside alone made application for writ of error.

It is thought that a brief statement will answer the purposes of this opinion. Whiteside and another, whose interest he later acquired, owned a block of contiguous oil and gas leaseholds in Brown county comprising 1294 acres. They assigned to Trentman leases on four of the tracts aggregating 391 acres. Under the contract of assignment Trentman agreed to drill at least two wells at specified locations on the 391 acres. The first well drilled by him proved to be a "dry hole" and he never drilled the second well. His breach of contract in that respect is made the basis of this suit for damages.

In answer to special issues the jury found that, if Trentman had drilled a second well, it would not have produced oil in paying quantities. It further found that a material object and purpose of Whiteside in entering into the contract and assigning the leases to Trentman was to create an increased demand and market value for the leases retained by him; that if Trentman had begun drilling a second well within the specified time after he completed the first well, the demand for, and market value of the leases owned and retained by Whiteside would thereby have been increased; that there would have been an advanced market value of the retained leases during the time said well was being drilled; the amount of such increased market value was fixed by the jury at $1,440.25 and judgment rendered for such amount.

The law question presented for decision is this: Does the amount which the retained leases would have increased in market value during the process of drilling the second well, had same been drilled, measured the damage sustained by Whiteside. The Court of Civil Appeals held that it did not and we are of the opinion that its holding is correct. The only damage which Whiteside suffered, if any, was from loss of profits. As stated in the opinion of the Court of Civil Appeals:

"It is obvious, under the jury finding that such well would have been a dry hole, that after the completion of such well had it been drilled, plaintiff's retained leases would have had less value than before. Manifestly the plaintiff, had the well been drilled would have had three courses open to him. 1. He could have sold, during the time the well was being drilled all of said retained leases and realized the profit from the enhanced value thereof caused by the drilling. 2. He could havè sold part of such lease and retained the remainder awaiting completion of such well, taking his chances on a greater profit to him if the well proved to be a producer. Or, 3. He could have retained all of said leases 'riding the well down,' as designated by some of the speculators in such matters, thus gambling on a greater profit if the well were a producer. If it had been a dry hole, as the jury found it would have been, manifestly he would have realized no profits from his leases had he pursued the course stated in 3 above; and may or may not have realized any profit had he pursued the course stated in 2. Under the jury findings as to the amount of enhanced values, he could have realized same in full only·by sale, prior to completion, of all of his leases at the values found by the jury. * * *."

Whiteside still stands upon the proposition that the trial court employed the correct standard for measuring his damages. The weakness of his position lies in the fact that there were no special issues submitted to the jury calling for findings on the question of whether or not Whiteside would have sold his leases while the drilling was in progress and, without such findings there is no basis for determining that he suffered any loss at all. The defendant prepared such special issues and requested the court to submit them, but the court refused to do so. The requested issues called for findings on whether Whiteside could have sold any of his leases, whether he would have sold same, and how much money, if any, he would have received from the sale thereof. The Court of Civil Appeals held that, in the absence of findings on those issues there was no basis in the verdict for the trial court's judgment, grounding its opinion primarily upon our holding in Riddle v. Lanier, 136 Texas 130, 145 S. W. (2d) 1094.

We have concluded that there is no material distinction between the two cases. In the Riddle-Lanier case, as here, the jury found, in effect, that the well would have been a dry hole, and there, as here, there was no finding that plaintiff would have sold his retained leases while the well was being drilled. In short, the two cases are almost identical in fact and in the find-

ings by the jury. The rule for measuring the damages relied upon by Whiteside in this case was expressly rejected in that case, the basis of the opinion being that the plaintiff would not have been affected by a rise or fall in the market value unless he had sold his leases, since his damage, if any, was loss of profits.

In the case of National Bank of Cleburne v. Pittman Roller Mill (Com. App.) 265 S. W. 1024, 36 A. L. R. 1405, damages were sought for the breach of a contract by the bank to lend money to Pittman with which to buy wheat. It was shown that, had the loan been made, the plaintiff could have and would have purchased 14,000 bushels of wheat at $1.00 per bushel in June and July and could have sold it in September for $1.60 per bushel. The trial court rendered judgment in favor of the plaintiff for the difference or profits amounting to $8,400.00. There was no finding that the plaintiff would have sold his wheat on the advanced market, but the evidence indicated that he would have milled the wheat and not have sold it at all. In that state of the record it was held that the increase in the market value of the wheat did not, within itself, afford a proper measure of the plaintiff's damages; that whether or not it did was to be determined by an answer to the further question of whether or not he would have sold upon the market. That is the principle upon which the decision in the Riddle-Lanier case is based.

In the opinion in Riddle v. Lanier it was pointed out that there was good authority for the holding that this character of alleged profit is too remote and speculative to form the measure of special damages, and in that connection there was cietd the case of Artwein v. Link, 108 Kansas 393, 195 Pac. 877. In view of the fact that this case is to be retried, we feel called upon to express our views upon this question, even though Trentman filed no application for writ of error. The ancient rule which excluded profits as an element of damages has long since been departed from. Southwest Battery Corporation v. Owen, 131 Texas 423, 115 S. W. (2d) 1097. In 15 Am. Jur., Damages, Sec. 149, the rule is stated in this language: "It may therefore be said that lost profits are a proper element of damage where such loss is the direct and necessary result of the defendant's acts, or where, in cases involving a breach of contract, the loss of profits may reasonably be supposed to have been within the contemplation of the parties when the contract was made, as the probable result of its violation, and where, in either class of cases, such profits can be shown with a reasonable degree of certainty." That rule was followed in National Bank of Cleburne v. Pittman Roller Mill, supra. Many other cases from this jurisdiction announcing, in effect, the same rule are

cited in the notes to 15 Tex. Jur., pp. 198-199, Sec. 102, and pp. 202-203, Sec. 105. Profits are not always speculative and remote. Whether in a given case they should be so classified depends altogether upon the facts and circumstances of that particular case. We recognize that it will be a somewhat unusual proceeding to try the issue of what Whiteside would have done had Trentman not breached his contract, but it cannot be said, as a matter of law, in advance of a hearing that he will be unable to make a satisfactory showing that loss of profits resulted from the breach. If he makes such showing, no reason is perceived why he should not be awarded a recovery therefore. Such profits might reasonably have been foreseen as a probable consequence of the breach, and that, in the final analysis, is the applicable test.

The judgment of the Court of Civil Appeals reversing and remanding the case is affirmed.

Opinion adopted by the Supreme Court April 14 ,1943.